Peter J. Mucchetti (DCB No. 463202)
U.S. Department of Justice Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
peter.j.mucchetti@usdoj.gov
Telephone: (202) 353-4211
Facsimile: (202) 307-5802
    Attorneys for the United States

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF IDAHO, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Case No. 10-268-S.EJL |
| vs. | ) ) ) | **COMPETITIVE IMPACT STATEMENT** |
| IDAHO ORTHOPAEDIC SOCIETY, TIMOTHY DOERR, JEFFREY HESSING, IDAHO SPORTS MEDICINE INSTITUTE, JOHN KLOSS, DAVID LAMEY, and TROY WATKINS, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry

in this civil antitrust proceeding.

## I.  NATURE AND PURPOSE OF THE PROCEEDING

On May 28, 2010, the United States and the State of Idaho filed a civil antitrust

Complaint, alleging that the Defendants Idaho Orthopedic Society ("IOS"), Dr. Timothy Doerr,

Dr. Jeffrey Hessing, Idaho Sports Medicine Institute ("ISMI"), Dr. John Kloss, Dr. David

Lamey, and Dr. Troy Watkins violated Section 1 of the Sherman Act and Idaho Code Section

48-101 *et seq.* of the Idaho Competition Act.  The Defendants and other competing orthopedists

in the Boise, Idaho, area formed two conspiracies to gain more favorable fees and other

contractual terms by agreeing to coordinate their actions, including denying medical care to

injured workers.

The Complaint alleges that, in the first conspiracy, Defendants and their co-conspirators

agreed, through a series of meetings and other communications, not to treat most patients

covered by workers' compensation insurance.  Defendants entered into this group boycott to

force the Idaho Industrial Commission to increase the rates at which orthopedists are reimbursed

for treating injured workers.  Defendants' group boycott, which resulted in a shortage of

orthopedists willing to treat workers' compensation patients, caused the Idaho Industrial

Commission to increase rates for orthopedic services substantially above levels set just a year

earlier.

In a second conspiracy, the Complaint alleges that Defendants (except for Defendant

Lamey) and other conspirators agreed, through a series of meetings and other communications,

to threaten to terminate their contracts with Blue Cross of Idaho ("BCI") to force it to offer better

contract terms to orthopedists.  Their collusion caused BCI to offer orthopedists more favorable

contract terms than BCI would have offered but for the participating Defendants' group boycott

of BCI.

With the Complaint, the United States and the State of Idaho filed a proposed Final

Judgment that enjoins the Defendants from agreeing with competing physicians to threaten to

terminate contracts with payers or deny medical care to patients, as more fully explained below.

The United States, the State of Idaho, and Defendants have stipulated that the proposed Final

Judgment may be entered after compliance with the APPA, unless the United States withdraws

its consent.  Entry of the proposed Final Judgment would terminate this action, except that the

Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed

Final Judgment and to punish violations thereof.

## II.  DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS OF THE ANTITRUST LAWS

### A.       The Defendants

The IOS is a membership organization that, from 2006 to 2008, consisted of

approximately 75 orthopedists, each of whom practiced in a solo or group practice.  These solo

and group practices were economically independent of, and competed with, each other.

Defendants Doerr, Hessing, Kloss, Lamey, and Watkins are physicians who provide orthopedic

services in the Boise, Idaho, area and who were members of the IOS.  Defendants Kloss and

Lamey formerly practiced with Orthopedic Centers of Idaho, P.A., d.b.a. Boise Orthopedic

Clinic ("BOC").  ISMI is an orthopedic practice group in Boise.  Most of the orthopedists that

practice with ISMI were members of the IOS.  The Defendants were the principal actors in the

boycotts of Idaho's workers' compensation system and BCI.

### B.       The Alleged Violations

#### 1.       *Idaho Workers' Compensation System Conspiracy*

The Idaho Workers' Compensation Act, Idaho Code Section 72-101 *et seq.*, requires that

most public and private employers in Idaho carry workers' compensation insurance for their

employees.  The Idaho Industrial Commission is the state agency responsible for regulating workers' compensation insurance in Idaho.

Since 2006, the Idaho Industrial Commission has set the fee schedule that determines the amount that orthopedists and other healthcare providers usually receive for treating patients covered by workers' compensation insurance.  The fee schedule uses a methodology for determining physician payments called a Resource-Based Relative Value System or RBRVS. The RBRVS methodology uses a "relative value unit" and a "conversion factor" to determine physician payment.  The relative value unit measures the resources necessary to perform a medical service.  For example, a complicated surgical procedure has a higher relative value unit than a simple office visit.  The conversion factor is a set dollar amount, for example, $100.  A physician's payment for any medical service is generally calculated by multiplying the relative value unit by the conversion factor.  For example, a physician would receive $500 for a medical service with a relative value unit of 5 and a conversion factor of $100.

In February 2006, the Idaho Industrial Commission announced a new fee schedule using the RBRVS methodology and setting a conversion factor of $88 for many orthopedic procedures. The new fee schedule had an effective date of April 1, 2006.  Many orthopedists believed this conversion factor would result in lower payments to orthopedists.  In response to the Idaho Industrial Commission's new fee schedule, Defendants and their co-conspirators agreed, through a series of meetings and other communications that took place over a year-long period, not to treat most patients covered by workers' compensation insurance.

Shortly after the Idaho Industrial Commission announced the February 2006 fee schedule, many Boise-area orthopedists from competing practices discussed with one another whether to accept the proposed rates or, alternatively, to stop treating workers' compensation

patients.  For example, at Defendant Doerr's invitation, orthopedists from several competing

practices met on March 2, 2006, to talk about "the physician response to the new fee schedule."

Also on March 2, 2006, an orthopedist specializing in hand surgery sent an e-mail to several

competing orthopedic hand surgeons saying that the new conversion factors represented a severe

cut in workers' compensation payments and that, at Defendant Doerr's meeting that night,

orthopedists would examine their options.  On the same day, Defendant Lamey wrote to a

competing orthopedist that he did "not have much problem dropping out of work comp."  The

day after the March 2, 2006 meeting, orthopedists from two competing practices sent letters to

the Idaho Industrial Commission announcing their intention to stop treating workers'

compensation patients.

     Many of the orthopedists that initially boycotted the workers' compensation system were

orthopedists who specialized in hand surgery.  For example, on April 12, 2006, seven hand

surgeons met "to discuss the various docs' interest in continuing to participate" in Idaho's

workers' compensation system.  An e-mail describing this meeting noted that Defendant Lamey

and a competing orthopedist favored "ditching" workers' compensation and that Defendant

Kloss agreed but wanted to negotiate a rate increase with the Idaho Industrial Commission.  The

day after that meeting, Defendants Kloss and Lamey stopped treating workers' compensation

patients, with the exception of emergency room patients.

     A June 6, 2006 letter from the IOS leadership, including Defendants Watkins and Kloss,

to members instructed them that they "'must, indeed, all hang together or, most assuredly, we

shall all hang separately.'"  The letter noted that orthopedists "must act together" concerning the

workers' compensation fee schedule and "collectively join our efforts for our practices" to

negotiate a more favorable fee schedule.

Minutes from a BOC board of directors meeting on June 12, 2006, state that BOC's president told the board that Boise-area orthopedists specializing in hand surgery "have stopped taking new work comp patients."  The minutes continue, saying, "Dr. Kloss confirmed this, except for [emergency room] call patients.  [Defendant Kloss] said there has been an appeal for orthopedists to support the hand surgeons in their effort to demonstrate the inadequacy of payment for some orthopedic procedures."

On September 12, 2006, orthopedists from competing practices attended a meeting organized by Defendants Doerr and Hessing to discuss workers' compensation fees.  Within ten days of the meeting, ISMI and two other large orthopedic practices in the Boise area stopped treating workers' compensation patients.

By October 2006, most of the approximately 65 orthopedists in the Boise area had stopped seeing most workers' compensation patients.  Five of the few remaining Boise orthopedists who continued to care for workers' compensation patients worked at BOC.  Other orthopedists encouraged and pressured those BOC orthopedists to join the boycott and stop seeing workers' compensation patients.  The October 9, 2006 BOC board of directors meeting minutes report that BOC's president also encouraged these five BOC orthopedists to join the boycott.  He explained that if the doctors were to stop treating new workers' compensation patients, the workers' compensation system would "be brought to a virtual standstill," increasing the doctors' negotiating leverage.

Over the following months, orthopedists and practice administrators regularly monitored adherence with the group boycott and pressured doctors to maintain a disciplined front.  For example, on November 27, 2006, an ISMI administrator assured a competing practice that although ISMI had recently accepted one workers' compensation patient to offer a second

opinion, it would not do so again, lest it "risk the rath [*sic*] of all the orthopedic surgeons because we're doing this."  The ISMI administrator assured the competing practice group that ISMI was "turning away all other worker's comp cases," and asked the recipient to "[p]lease tell your docs what we did so it doesn't come back and sound worse than it already is!"

Defendants and their co-conspirators refused to treat most workers' compensation patients because they believed that if injured workers were unable to find orthopedists willing to treat them, the Idaho Industrial Commission would be forced to increase the orthopedist fee schedule.  An ISMI employee explained that her practice's "lack of participation, along with others in the area, may cause them [i.e., the Idaho Industrial Committee] to review their current Proposed Rule, which also includes the fee schedule."  A January 2007 IOS newsletter notes that "lack of access [to orthopedists] is the key" to increased workers' compensation rates.

According to the February 5, 2007 minutes of the Idaho House of Representatives Commerce & Human Resources Committee, Defendant Watkins openly discussed that physicians had agreed not to treat most workers' compensation patients.  The minutes describe Dr. Watkins as stating that "[a] group of physicians met and decided that the [fee] table was not satisfactory.  They decided to stop seeing workers' compensation patients [except] in the emergency room, and stop seeing and giving second opinions until discussion happened about [the] conversion factor chart."

In the face of an effective and widely adhered to group boycott, in February 2007, the Idaho Industrial Commission announced workers' compensation rates that were up to 61% higher than the rates that the Commission had announced a year earlier.  After the new rates were announced, the Defendants and their co-conspirators agreed to end their boycott and accept the new rates.  In a February 13, 2007 letter to IOS membership, Defendant Watkins wrote, "We

. . . all think this [the higher fee schedule] represents a major accomplishment, and that we should accept it now."  Shortly thereafter, Defendants and almost all of the orthopedists who had participated in the conspiracy resumed participation in the workers' compensation system.

2.   *Blue Cross of Idaho Conspiracy*

BCI is a not-for-profit mutual insurance company that offers a wide range of healthcare plans to employers and other groups in Boise and other areas of Idaho.  To offer these plans, BCI contracts with orthopedists and other physicians to provide medical services.  BCI's contracts with orthopedists set the reimbursement amounts that BCI pays orthopedists for providing covered health care to BCI's enrollees.

In December 2007, BCI informed its network of orthopedists and other physicians of new rates that would take effect on April 1, 2008.  Some of the Defendants and other orthopedists were concerned that the new rates were lower than BCI's previous rates.  Before the rates became effective, several of the Defendants and other competing orthopedists communicated with each other their dissatisfaction with BCI's proposed rates.  In addition, on February 22, 2008, Defendant Watkins sent a letter to BCI saying that "[m]any of our members are worried that they may not be able to sustain some of the reductions they are facing with the proposed 2008 rates."

On April 9, 2008 – eight days after the new BCI rates took effect – the IOS sponsored an "Orthopedic Open House" at Defendants Hessing and Doerr's office.  At this meeting, the orthopedists discussed how to respond to BCI's adoption of new rates and encouraged others to send termination notices to BCI.  Defendants Doerr and Hessing encouraged the orthopedists in attendance to put an ad in the newspaper to alert their patients and to assure other orthopedists that they were joining the boycott.  Shortly after the Orthopedic Open House, orthopedists began

issuing termination notices to BCI and advertising their intended withdrawals in local newspapers.  Between April and June 2008, twelve practice groups – representing approximately 31 of 67 orthopedists in the Boise area at the time – gave BCI notice that they would withdraw from BCI's network.  This group included many IOS practice groups, including the practice group of Defendants Hessing and Doerr, and ISMI.

From April to June 2008, while orthopedic groups were sending termination notices to BCI, orthopedists communicated with each other to encourage others to withdraw from the BCI network.  As part of this communication, many practices placed newspaper advertisements announcing their withdrawal from the BCI network.  In addition, orthopedists discussed how the successful boycott of workers' compensation patients provided the model for collectively standing up to BCI and negotiating higher rates.

In June 2008, Defendant Watkins attempted to negotiate with BCI on behalf of competing orthopedists.  He asked that BCI representatives meet with himself, Defendant Hessing and Defendant Kloss (all of whom were in competing practices).  In a separate June 2008 meeting, Defendant Watkins told BCI representatives that Idaho's orthopedists were a "very cohesive group" that had been successful in their efforts related to workers' compensation payments the previous year.  Defendant Watkins also encouraged BCI to negotiate with practices that had already sent termination notices to BCI because otherwise BCI would experience a severe shortage of orthopedists in its network.

In response to the orthopedists' group boycott, on June 18, 2008, BCI offered orthopedists an additional contracting option to encourage orthopedists to continue to participate in BCI's provider network.  The new option allowed orthopedists to choose between continuing to participate in BCI's network at current rates for one year with the possibility for higher rates

the next year or to lock in existing rates for a three-year period.

The new offer from BCI divided Boise's orthopedists.  In July 2008, when the conspirators failed to convince a large Boise orthopedic practice to join the boycott of BCI and that practice decided to continue its participation with BCI, BCI was able to contract with a sufficient number of orthopedists to maintain a viable physician network.  Realizing that no further concessions beyond BCI's new offer would be forthcoming, practice groups began rescinding their termination notices.  By the end of August 2008, most orthopedic practices had rescinded their termination notices and remained in the BCI network.

### III.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment will prevent the recurrence of the violations alleged in the Complaint and preserve competition for patients and other purchasers of orthopedic services, including self-insured employers and health and workers' compensation insurers in the Boise, Idaho area and elsewhere.

Under the proposed Final Judgment, the Defendants each are enjoined from, in any manner, directly or indirectly:

(A)      encouraging, facilitating, entering into, participating, or attempting to engage in any actual or potential agreement or understanding with, between or among competing physicians about:

(1)  any fee, or other payer contract term or condition, with any payer or group of payers, including the acceptability or negotiation of any fee or other payer contract term with any payer or group of payers;

(2)  the manner in which the defendant or any competing physician will negotiate with, contract with, or otherwise deal with any payer or group of payers, including

10

participating in or terminating any payer contract; or

      (3)  any refusal to deal or threatened refusal to deal with any payer; or

(B)     communicating with any competing physician or facilitating the exchange of information between or among competing physicians about:

      (1)  the actual or possible view, intention, or position of any defendant or his or her medical practice group, or any competing physician concerning the negotiation or acceptability of any proposed or existing payer contract or contract term, including the negotiating or contracting status of the defendant, his or her medical group, or any competing physician with any payer or group of payers, or

      (2)  any proposed or existing term of any payer contract that affects:

        (a)  the amount of fees or payment, however determined, that the defendant, his or her medical practice group or any competing physician charges, contracts for, or accepts from or considers charging, contracting for, or accepting from any payer or group of payers for providing physician services;

        (b)  the duration, amendment, or termination of any payer contract; or

        (c)  the manner of resolving disputes between any parties to any payer contract.

     Subject to these restrictions, Section V of the proposed Final Judgment permits Defendants to discuss with any competing physician any medical topic or medical issue relating to patient care and participate in activities of any medical society.  Moreover, nothing in the proposed Final Judgment prohibits Defendants from advocating or discussing, in accordance with the *Noerr-Pennington* doctrine, legislative, judicial, or regulatory actions, or other governmental policies or actions; participating, or engaging in communications necessary

11

to participate, in lawful surveys or activities by clinically or financially integrated physician network joint ventures and multi-provider networks as those terms are used in Statements 5, 6, 8 and 9 of the 1996 Department of Justice and Federal Trade Commission Statements of Antitrust Enforcement Policy in Health Care, 4 Trade Reg. Rep. (CCH) ¶ 13,153.

Finally, Section V(B)(3) of the proposed Final Judgment does not prohibit Defendants from engaging in conduct solely related to the administrative, clinical, financial, or other terms of providing on-call coverage at a hospital or hospital system.  Such conduct might not violate the antitrust laws if it creates significant efficiencies and, on balance, is not anticompetitive.[1]  However, the proposed Final Judgment makes clear that Section V(B)(3) of the proposed Final Judgment is not a determination that such conduct does not violate any law enforced by the United States Department of Justice or the Office of the Idaho Attorney General.  Rather, the United States has made no determination with respect to the legality of any such conduct.  The United States retains its ability to challenge any conduct related to providing on-call coverage if it later determines that such a challenge is warranted under the law.

To promote compliance with the decree, the proposed Final Judgment also requires that the Defendants provide to their respective practices' chief administrative employee, other physicians in their practices, and/or members, copies of the Final Judgment and this Competitive Impact Statement.  For a period of ten years following the date of entry of the Final Judgment, the Defendants separately must certify annually to the United States whether they have complied with the provisions of the Final Judgment.

---

[1]  *See* Dep't of Justice and Federal Trade Comm'n, Statements of Antitrust Enforcement Policy in Health Care § 8(B) (1996).

12

## IV.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.  PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.  All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.  The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Joshua H. Soven
> Chief, Litigation I Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, NW, Suite 4100
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.  ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  The United States is satisfied, however, that the relief in the proposed Final Judgment will prevent the recurrence of the violations alleged in the Complaint and preserve competition for patients and other purchasers of orthopedic services in Idaho.  Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.  STANDARD OF REVIEW UNDER THE APPA FOR THE
## PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

(A)     the competitive impact of such judgment, including termination of alleged
        violations, provisions for enforcement and modification, duration of relief

sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3, (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable.").[2]

Under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With respect

---

[2]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms.  *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted

evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d

456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir.

1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d

37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a
> proposed antitrust consent decree must be left, in the first instance, to the
> discretion of the Attorney General.  The court's role in protecting the public
> interest is one of insuring that the government has not breached its duty to the
> public in consenting to the decree.  The court is required to determine not
> whether a particular decree is the one that will best serve society, but whether
> the settlement is "*within the reaches of the public interest*."  More elaborate
> requirements might undermine the effectiveness of antitrust enforcement by
> consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In determining whether a

proposed settlement is in the public interest, a district court "must accord deference to the

government's predictions about the efficacy of its remedies, and may not require that the

remedies perfectly match the alleged violations."  *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see*

*also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the

government's predictions as to the effect of the proposed remedies"); *United States v. Archer-*

*Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant

---

[3]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the
[APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette
Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to
"look at the overall picture not hypercritically, nor with a microscope, but with an artist's
reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies
[obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the
'reaches of the public interest'").

due respect to the United States' prediction as to the effect of proposed remedies, its perception

of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting

their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree

must be approved even if it falls short of the remedy the court would impose on its own, as

long as it falls within the range of acceptability or is 'within the reaches of public interest.'"

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted)

(quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom.*

*Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum*

*Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the

court would have imposed a greater remedy).  To meet this standard, the United States "need

only provide a factual basis for concluding that the settlements are reasonably adequate

remedies for the alleged harms."  *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in

relationship to the violations that the United States has alleged in its Complaint, and does not

authorize the court to "construct [its] own hypothetical case and then evaluate the decree

against that case."  *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787,

at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the

complaint against those the court believes could have, or even should have, been alleged").

Because the "court's authority to review the decree depends entirely on the government's

exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the

court is only authorized to review the decree itself," and not to "effectively redraft the

17

complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As the United States District Court for the District of Columbia recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This language effectuates what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[4]

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis

## VIII.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that

were considered by the United States in formulating the proposed Final Judgment.

 Dated: May 28, 2010

<div style="margin-left: 50%;">

Respectfully submitted,

/s/_____
Peter J. Mucchetti
Julie A. Tenney
United States Department of Justice
Antitrust Division, Litigation I Section
450 Fifth Street, N.W., Suite 4100
Washington, D.C.  20530
Telephone: (202) 353-4211
Facsimile: (202) 307-5802
peter.j.mucchetti@usdoj.gov

</div>

of briefs and oral arguments, that is the approach that should be utilized.").

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2010, I filed the foregoing Complaint, Explanation of Consent Decree Procedures, Stipulation, proposed Final Judgment, and Competitive Impact Statement electronically through the CM/ECF system and that on this date, I served the following non-CM/ECF Registered Participants in the manner indicated:

Via first class mail, postage prepaid and email addressed as follows:

For Defendants Idaho Orthopaedic Society, Timothy Doerr, Jeffrey Hessing, Idaho Sports Medicine Institute, John Kloss, and Troy Watkins:

Mark J. Botti
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave., N.W.
Washington, DC 20036-1564
mbotti@akingump.com


For Defendant David Lamey:

Steven J. Hippler
Givens Pursley LLP
601 W. Bannock St.
Boise, Idaho 83702
sjh@givenspursley.com


/s/_____
Peter J. Mucchetti
United States Department of Justice
Antitrust Division, Litigation I Section
450 Fifth Street, N.W., Suite 4100
Washington, D.C.  20530
Telephone: (202) 353-4211
Facsimile: (202) 307-5802
peter.j.mucchetti@usdoj.gov